Jaffray & Co. et al. v. Greenbaum et al.

JAFFRAY & CO. ET AL. v. GREENBAUM ET AL.

1. **Assignment for Benefit of Creditors:** CHATTEL MORTGAGES NOT AMOUNTING TO. Upon consideration of the evidence in this case, it is *held* that a certain chattel mortgage made upon a stock of goods to trustees, to secure certain creditors, did not cover all the property of the mortgagors, and was not made without hope of redemption, and was not in effect an assignment for the benefit of creditors, and void because not including all the creditors.

2. **Chattel Mortgage of Stock of Goods:** POSSESSION AND SALE BY MORTGAGORS: STOCK TO BE KEPT UP: MORTGAGE NOT VOID. A chattel mortgage, given to trustees upon a stock of goods to secure certain creditors, is not void as a matter of law because it provides for an extension of the time of the indebtedness, and that the mortgagors shall have the right to retain possession and carry on the business in the usual retail way for one year, paying the cost and expenses of running the business, and keeping up the stock to what it was when the mortgage was given. *Hughes v. Cory*, 20 Iowa, 399, followed.

3. ————: POSSESSION BY MORTGAGEES: NOTICE TO SUBSEQUENT ATTACHING CREDITORS. Where mortgaged chattels have passed into the hands of the mortgagees, such possession is notice of their interest to subsequent attaching creditors, and it is immaterial in such case that the mortgage was not recorded.

4. **Lease:** REDUCTION OF RENT RESERVED: CONSIDERATION. Where the owners of a business house had leased it to a firm for $5,000 per year, but the firm became embarrassed, and the lessors, believing that a failure of the firm would be a detriment to them, and with a view of assisting

it, indorsed upon the lease these words: "For value received, the rent reserved in the above lease is reduced to $3,200 per year from July 1, 1878," *held* that there was a valid consideration for the reduction, and that the lessors were bound thereby.

### *Appeal from Des Moines District Court.*

### THURSDAY, OCTOBER 9.

THE defendants, Greenbaum, Schroder & Co., at the time of the transactions in question, were merchants, and doing business as such in the city of Burlington. The plaintiffs, E. S. Jaffray & Co., and Dunham, Buckley & Co., were creditors of Greenbaum, Schroder & Co. As such, they brought their respective actions in attachment against them. Afterwards, for the purpose of determining the priority of their liens by attachment over certain mortgages, they joined and brought this action in equity, making Greenbaum, Schroder & Co., and the persons named in the mortgages as trustees, defendants. With this action were consolidated other actions, to-wit, the actions in attachment above mentioned, and an action in equity, brought by Gilbert, Hedge & Co. against Greenbaum, Schroder & Co., to assert a lien for rent upon a stock of goods covered by the attachment. In these actions certain persons intervened.

The question presented in the equitable action brought by Gilbert, Hedge & Co., as landlords, is as to the amount that should be allowed them as rent. The attachment liens were held inferior to the mortgage liens, and the attaching creditors appeal. The principal part of the amount claimed by Gilbert, Hedge & Co. as rent was allowed them, and the defendants in that action appeal.

*Hall & Huston,* for E. S. Jaffray & Co. and Dunham, Buckley & Co., appellants.

*Newman & Blake* and *P. Henry Smythe & Son,* for Greenbaum, Schroder & Co. *et al.,* defendants in the equitable action brought by Gilbert, Hedge & Co. against them, appellants.

*Hedge & Blythe*, for Gilbert, Hedge & Co., appellees.

*Newman & Blake* and *P. Henry Smythe & Son*, for the trustees in the contested mortgages, appellees.

ADAMS, J.—I. On the fourteenth day of May, 1879, Greenbaum, Schroder & Co. executed a mortgage or deed of trust upon their stock of goods in Burlington, to secure $39,167.74, due to fourteen different creditors who were named therein. The instrument, whatever it is, (which we will call a mortgage, because it is generally so spoken of,) was executed to Max Landauer, J. Freudenthal and E. Raab, and purported to convey the property to them as trustees. Greenbaum, Schroder & Co. also executed a similar mortgage to them upon certain real estate in Burlington, and a similar mortgage upon a stock of goods in Lincoln, Nebraska. The writs of attachment appear to have been levied about a month later. On the twenty-fifth of June, 1879, this action in equity was brought by the attaching creditors. They averred in their petition that the mortgages are fraudulent and void, because made with the intent to hinder and delay the unsecured creditors. They also averred that the several mortgages and instruments were made in contemplation of insolvency, and constituted a general assignment, but that such assignment was void under the statute, because not made for the benefit of all the creditors. They asked for the appointment of a receiver.

The first question argued arises under the averment last above set out. The statute upon which the attaching credi-

1. ASSIGN-
MENT for
benefit of
creditors :
chattel mort-
gages not
amounting to.

tors rely is section 2115 of the Code. It is in these words: "No general assignment of property by an insolvent, or in contemplation of insolvency, for the benefit of creditors shall be valid, unless it be made for the benefit of all his creditors in proportion to the amount of their respective claims." The attaching creditors insist that the mortgages covered substantially all the mortgagor's property, and were given under

such circumstances as to preclude the supposition that they were really intended as security. They contend that the mortgagor's real purpose was to virtually turn out the property in payment as far as it would go, and that they had no hope of redeeming, and no intention of trying to redeem. If the facts were as the attaching creditors contend, it might be conceded that the mortgages constituted a general assignment, and that, being such, they cannot, under the statute, be sustained, because their effect, undeniably, was to give a preference to creditors.

But there was evidence tending to show that the mortgages did not cover substantially all the mortgagors' property, and were not designed to; and we think that the evidence is such as to justify us in concluding that such was the fact. But, whether we are correct in this or not, it seems clear to us that the mortgages cannot be regarded as an assignment. We are well satisfied that the mortgagors did not execute them without a hope of redemption, and did not regard them as a mode of making a final disposition of the property under an appearance of giving security. It may be that they were badly insolvent, and that the property mortgaged was insufficient to pay the mortgage debts, yet we think that the mortgagors did not so regard it at the time. The mortgage debts were less than $40,000, and the mortgagors had a short time before estimated their assets at $73,000, and, even after the execution of the mortgages, they estimated their assets, mostly covered by the mortgages, at $48,000. We cannot think that they were intended as an assignment.

The attaching creditors contend, however, that, even if this is so, they should be declared void as a matter of law, because fraudulent upon their face. They provide that the mortgagors shall have the right to retain possession of the property, and carry on their business in the usual retail way for one year, paying the cost and expense of running the business, and keeping up the stock to about what it then was.

**2. CHATTEL** mortgage of stock of goods : possession and sale by mortgagors: stock to be kept up: mortgage not void.

The mortgages also provided for an extension of the time of indebtedness mentioned, and that no creditor named therein should have any benefit from the mortgages, unless he should expressly accept the conditions thereof.

A mortgage upon a stock of goods which should provide for sales that would exhaust the stock, without any provision for an application of the proceeds on the mortgage debt, might well be declared fraudulent. Such a mortgage could hardly be deemed to have been taken as security, and, if it was not taken as security, the inference would be that it was solely for the debtor's protection by hindering other creditors. But in this case the stock was not to be exhausted, but was to be kept up. The mere fact that there might be profits above what might be necessary to keep up the stock and pay running expenses would not invalidate the mortgage. In *Hughes v. Cory*, 20 Iowa, 399, it was expressly provided in the mortgage that the mortgagor, after keeping up the stock, might retain sixty-seven per cent of the proceeds of sales, but it was held that such provision did not invalidate the mortgage. As to what should be done with any surplus which there might be in the case at bar, there is no provision. If it should be conceded that the mortgagors might retain it, we think that the case would still fall under the principle decided in the case above cited. It may be very important that the mortgagors shall be allowed to use such surplus, in whole or in part, in paying other creditors. At all events, if the mortgagors are allowed to retain it, and the other creditors are entitled to demand that it be applied upon their debts, and it is not so applied, they have their remedy, as pointed out in the case above cited.

The essential idea is that, where a mortgage provides that the security shall be kept good, a court cannot declare, as a matter of law, that it appears upon the face of the mortgage that it was not given as security, and that it is therefore void. We think, then, that the attaching creditors' position in this respect cannot be sustained.

But they contend that it appears from extrinsic evidence that the mortgages are fraudulent in fact. Their position is that, while it may be true that the mortgages were designed to some extent as security, it appears that such was not their sole design, even on the part of the secured creditors, but that they were actuated by a fraudulent intent to hinder other creditors.

The effect of every mortgage is necessarily to hinder, to some extent, unsecured creditors. That the secured creditors in this case were actuated by any motive other than a desire to protect themselves, we have failed to discover any satisfactory evidence. The attaching creditors rely upon a large number of circumstances, which their able counsel have set forth with such fullness and ingenuity as to lead us to suspect that they may believe that the secured creditors did not act solely for their own protection and with pure motives. But we are unable to attach the importance to these circumstances which they appear to. Whatever may have been the plans of Greenbaum, Schroder & Co., we are well satisfied that no fault is to be imputed to those creditors whom they elected to secure. Their course, as disclosed in the evidence, seems. to us to differ in no respect from that of creditors generally,. who manage to obtain security, while others are left. Where· a debtor gives a preference, he doubtless often, and, perhaps. usually, selects from his creditors his most intimate friends, and others from whom he thinks that he can get the best· terms. Such, we judge, was the basis of the preference given, in this case.

Upon questions of fraud, where a large number of circum-- stances are relied upon, as in this case, it is not our custom to. set out the evidence and discuss it in detail. Our custom is. to state our conclusion merely.

A question pertaining to a portion of the goods remains to. be considered. The mortgage which was executed upon the· stock at Lincoln, Nebraska, was never recorded in Nebraska,. or elsewhere. That stock was brought to Burlington,.

3. ———:
possession by
mortgagees:
notice to sub-
sequent
attaching
creditors.

and added to the Burlington stock, and was a part of the goods afterwards attached. The attaching creditors contend that the Nebraska goods, though added to the Burlington stock, was not covered by the mortgage executed upon the Burlington stock, and that, as to the other mortgage designed to be recorded in Nebraska, they say that they had no notice of it, the same not having been recorded anywhere. But the evidence shows that the Nebraska stock, before the attachments were levied, passed into the actual possession of the trustees designated in the mortgage. Such possession was, we think, sufficient to give constructive notice of their rights, and, if so, the attachments did not become paramount.

We come to the question presented by the defendants upon their appeal, in the action brought by Gilbert, Hedge & Co.

4. LEASE: re-
duction of
rent reserv-
ed: consider-
ation.

to enforce their lien for rent, under a lease made to Greenbaum, Schroder & Co., of the store building in which they did business. The claim made by Gilbert, Hedge & Co. was for rent at the rate of $5,000 a year. The defendants denied that they were entitled to more than $3,200 a year. The court below allowed, for the time in question, rent at the rate of $3,200 a year to April 1, 1880, and, for the remainder of the time, rent at the rate of $5,000 a year.

The lease commenced January 1, 1874, and was to continue ten years. The rent provided was at the rate of $4,500 a year for the first five years, and at the rate of $5,000 a year for the remainder of the term. In July, 1878, Greenbaum, Schroder & Co. became financially embarrassed, and had difficulty in continuing in business. A part of their embarrassment arose from the large rent provided in their lease. Under the statute and decisions of this court, the rent for the term became a lien upon all goods put into the store. Greenbaum, Schroder & Co., finding themselves embarrassed and their credit impaired, began to complain to their landlords in relation to the rent which they were paying, and asked a reduction. The

landlords, because of the situation of their tenants, and their complaint in relation to the rent, orally agreed to accept, and did accept, rent at the rate of $800 a quarter in full of their demand. In June, 1879, they made a similar agreement in writing. They made upon the lease an endorsement in these words: "For value received, the rent reserved on the above lease is reduced to $3,200 per year from July 1, 1878."

(Signed,) " GILBERT, HEDGE & Co."

They now aver that, notwithstanding this agreement, the rent was not in fact reduced, because they say that the agreement was obtained by fraud, and was without consideration. As to the fraud, we have to say that we find no evidence whatever. As to what the inducements were to make the agreement for reduction there is evidence, and the evidence is conflicting. One of the landlords testifies that it was a promise on the part of the tenants that they would procure a release of the mortgage given upon the stock, which promise was never fulfilled. Another one of the landlords says: "We reduced the rent to $800, because we did not consider them able to pay more at that time; we were anxious that they should succeed in business. It was worth something to us for them to succeed." This corroborates the testimony of some of the defendants, which was to the effect that the reduction was made to enable the tenants to effect a compromise with their creditors, and continue in business, and that they did effect a compromise and continue for a time. We believe that this was the reason for the reduction.

In our opinion, a consideration was not wanting. We regard the case essentially the same as if the original lease had been surrendered, and a new lease substituted, providing for a rent of $3,200 a year. A lease which provides for too high a rent may be less valuable to the landlord than one providing for a proper rent, and especially, if the tenant is a merchant, and can do business only by purchasing goods upon credit. The lease in question, with the rent reduced, was preferred by these landlords, as is shown by the fact that they

made the reduction on purely business considerations. They desired that their tenants should continue in business under circumstances which should afford more assurance of success. The tenants made arrangements to continue, and did continue, and paid rent at the rate of $800 per quarter for several quarters. If complete success had been secured, we do not think that a claim for rent would have been made at a higher rate. But the tenants were finally broken up and ceased business, and, the contest as to rent having arisen as, essentially, between the landlords and the creditors who sold goods to the tenants, the landlords have conceived the idea of avoiding their agreement. In our opinion, they cannot be sustained. We think that the court erred in rendering a decree for rent at a rate greater than at the rate of $3,200 a year for any part of the term.

Upon the appeal of the attaching creditors, E. S. Jaffray & Co. and Dunham, Buckley & Co., the judgment must be affirmed, and upon the appeal of the defendants, Greenbaum, Schroder & Co. *et al.*, in the action brought by Gilbert, Hedge & Co., the judgment must be

MODIFIED AND AFFIRMED.